NOT DESIGNATED FOR PUBLICATION

No. 113,972

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KENNETH WALSH,
In His Capacity as Successor Trustee of
THE UNILDA V. MOFFAT REVOCABLE TRUST,
and
as Executor of
THE ESTATE OF UNILDA V. MOFFAT, Deceased,
*Appellees*,

v.

BILL WEBER,
Individually and in His Capacity as Executor of
THE ESTATE OF ANNITA L. WEBER, Deceased,
*Appellants*,

and

KENNY DAINTY,
as Administrator of
THE ESTATE OF DONALD R. WEBER, Deceased,
*Defendant*.

MEMORANDUM OPINION

Appeal from Harvey District Court; RICHARD B. WALKER, judge. Opinion filed September 9, 2016. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Levi H. Goossen*, of Goossen Law Office, of Newton, for appellant.

*William P. Tretbar* and *Adam R. Burrus*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellee.

Before MALONE, C.J., GREEN and GARDNER, JJ.

1

*Per Curiam*: During the final years of her life, Unilda Moffatt engaged in two transactions, which are the source of this lawsuit. First, Unilda released Annita Weber and Don Weber from a written contract requiring them to convey their house to Unilda, allowing Annita and Don instead to convey their house to their son, Bill Weber. Second, Annita solicited a $100,000 check from Unilda. Following Unilda's death, Kenneth Walsh, as successor trustee of Unilda's revocable living trust and executor of Unilda's estate, sued Bill for unjust enrichment and sued Annita for breach of an oral contract. Kenneth argued that Bill would be unjustly enriched if he were allowed to retain the house conveyed to him by his parents: Kenneth alleged that Annita had assured Unilda that Bill would pay Unilda $100,000 if she would release Annita and Don from their contractual agreement to convey their house to Unilda. In addition, Kenneth maintained that the $100,000 check from Unilda to Annita was a loan. During litigation, Annita died, and Bill was substituted as a party in his capacity as the executor of Annita's estate.

Kenneth's case was tried before a jury. Although the jury considered both claims, it served in an advisory capacity on Kenneth's equitable unjust enrichment claim. The jury determined: (1) that Bill would be unjustly enriched if he were allowed to retain the house without payment to Unilda's estate; and (2) that Annita breached her oral contract with Unilda to repay the $100,000 check. The trial court adopted the jury's advisory findings and ordered: (1) that Bill was personally liable to Unilda's estate for $100,000, plus postjudgment interest; (2) that the disputed house must be placed in a constructive trust in favor of Unilda's estate; and (3) that Bill was liable in his capacity as executor of Annita's estate for $100,000, plus prejudgment and postjudgment interest.

Bill appeals, asserting that there were several errors requiring reversal. Specifically, Bill contends: (1) that Kenneth does not have standing to sue; (2) that Kenneth's claims were barred under the statute of limitations; (3) that the trial court committed several abuses of discretion; (4) that the trial court allowed inadmissible hearsay into evidence; (5) that the trial court made several jury instruction errors; (6) that

2

the trial court erred by finding that Bill was unjustly enriched; (7) that the trial court imposed inappropriate remedies; and (8) that the trial court erred in awarding postjudgment and prejudgment interest.

We find merit in Bill's argument that the trial court erred in holding him personally liable to Unilda's estate for $100,000 while also placing the disputed house in a constructive trust. He is correct that Kenneth, the successor trustee, had to elect between available remedies: constructive trust or damages. He is not permitted double compensation. Based on Kenneth's failure to elect remedies before entry of judgment in this matter, the trial court erred in ordering postjudgment interest on Bill's personal liability and in garnishing Bill's wages to satisfy his personal liability. Additionally, Bill successfully argues that the trial court erred in calculating postjudgment interest on Kenneth's breach of oral contract claim. Accordingly, we affirm in part, reverse in part, vacate in part, and remand with directions.

*Foundational Information*

When the major events of this case occurred, Unilda, Annita, and Don were all in their 70's and 80's. Unfortunately, Unilda died on September 2, 2010, Don died on November 13, 2010, and Annita died on February 3, 2013.

Kenneth is not a relative of Unilda and is not a beneficiary of Unilda's will (which was a pour-over will) or Unilda's trust. As both grantor and trustee of her revocable living trust, Unilda had full control over her trust during her lifetime. The final version of Unilda's trust dictated that the entirety of the residuary trust be divided between her four nephews.

3

*The Exchange of Property*

At some point following her husband's death in 2003, Unilda decided that she never wanted live in an assisted living facility. Unilda wished to live the remainder of her life on her 20-acre estate where she had a single-family home and where she boarded horses. Her estate was located on Hoover Road in Newton, Kansas (Hoover Road property). Unilda decided that she needed someone to maintain the property and to provide her with companionship, meals, and occasional transportation.

Unilda and Annita had known each other for over 30 years. In the past, Unilda had employed Annita at a jewelry store and at a convenience store she owned. Following her husband's death, however, Unilda became much closer with Annita. Unilda approached Annita and Don about helping take care of her at the Hoover Road property until her death. Annita and Don agreed. Because the parties recognized this would entail a lot of work, Unilda also agreed that Annita and Don would be entitled to some compensation for their help.

Unilda and Annita went to Hugh Gill, Unilda's attorney, to draft a contract expressing the specifics of their agreement. Under the contract entitled "Exchange Agreement," Unilda agreed to convey the Hoover Road property, which she believed to be valued around $230,000 to $250,000, to Annita and Don. In exchange, Annita and Don would convey their house and 2 1/2 acres of land located on Emma Creek Road (Emma Creek property) to Unilda's trust. Annita and Don believed the Emma Creek property was worth approximately $130,000. The exchange agreement stated that each party would convey the title of their property by delivering the respective deeds to one another no later than March 14, 2005. All parties signed the exchange agreement.

Moreover, although not expressly stated in the exchange agreement, it is undisputed that there were other conditions to Unilda, Annita, and Don's arrangement.

4

Specifically, Unilda was going to build a handicap accessible apartment on the Hoover Road property. When that was completed, she would move into the new apartment while Annita and Don would move into the main house on the Hoover Road property. Then, Unilda would have her own space on the land while having Annita and Don nearby to help her when needed. Annita and Don were to allow Unilda to live at the new apartment for the remainder of her life.

On March 14, 2005, Unilda conveyed the Hoover Road property to Annita and Don. After conveying the property, Unilda built and moved into the handicap accessible apartment, and Annita and Don moved into the main house. On March 12, 2007, Annita and Don recorded the deed to the Hoover Road property. Nevertheless, Annita and Don did not convey the Emma Creek property to Unilda. Instead, on the same day that they recorded the Hoover Road property deed, they conveyed the Emma Creek property to Bill and Bill's now ex-wife, Kandi. On April 24, 2007, Bill recorded the deed to the Emma Creek property.

Meanwhile, shortly after Hugh drafted the exchange agreement, Hugh became concerned because he had not heard from Unilda. Unilda had agreed to send him a signed copy of the exchange agreement, but she never did. On April 12, 2005, Annita called and told Hugh that she, Don, and Unilda had followed through on the exchange agreement and that Unilda had "filed the deeds of record herself." This further concerned Hugh because although he had prepared a deed for the transfer of the Hoover Road property to Annita and Don, he had not prepared a deed for the transfer of the Emma Creek property to Unilda. Annita told Hugh that she would have her own attorney look over the exchange agreement and prepare the Emma Creek property deed. Hugh, however, never heard from Annita's attorney.

5

Unilda and Hugh's next meetings did not occur until November 2007. The substance of those meetings were documented in a formal memorandum written by Hugh and his associate. The November 26, 2007, formal memorandum stated in part:

"Unilda Moffatt was fully aware of the fact that she had conveyed her house to Anita [*sic*] Weber and, at the same time, Anita Weber had conveyed her house to her son, Bill. [Unilda] was fully aware of the fact that Bill was the current title owner of Anita's former house and that Anita was the current title owner of Unilda's former house. Unilda expressed that the reason Anita conveyed her house to Bill instead of Unilda was to keep the transaction out of the press and publication. She pointed out that the Newton newspaper published real estate transactions and she did not want her late husband's former wife to become aware of the transaction that had occurred between Unilda and Anita. That transaction, according to Unilda, was that she agreed to transfer title of her property to Anita and Anita's husband in exchange for Anita and her husband's conveyance of their property to Unilda. As consideration, Anita agreed to take care of Unilda for the remaining portion of her life, and, in fact, in furtherance of that, had built an addition to the residence [on the Hoover Road property] allowing Unilda to stay at the residence in a separate area. Unilda continuously stated that she was very comfortable with the fact that the transaction had not been very well documented and did not wish to have [the] transaction documented any further.

". . . [Unilda] was fully aware that Bill was currently residing in the house that was previously owned by Anita and was aware of the fact that Bill would be purchasing the house from Unilda by making monthly payments to Unilda. Unilda knew the exact amount of the monthly payments. . . .

. . . .

"After explaining the risks of not documenting the transactions, Unilda agreed some type of documentation should be prepared that would accurately reflect the existing transactions between Unilda, Anita, and Bill. Those transactions . . . were as follows:

"1. Unilda conveyed her house to Anita and her husband, provided, however, that Anita agreed to take care of Unilda for the remainder of Unilda's life. . . .

"2. Unilda was to receive in exchange for conveyance of her house to Anita, Anita's house located in Newton. That exchange took place, but, at

6

Unilda's request, everyone agreed that in order to keep the transaction out
of the press, Anita would convey the house directly to her son Bill and
Bill would make monthly payments for the amount owed on the house."

The memorandum further stated that although this conversation with Unilda was private, Annita who was apparently at Hugh's office, was later asked to join the meeting. When Annita joined the meeting, she stated: (1) that Bill owed money to Unilda for the house; (2) that she would write a letter to Hugh documenting the transactions by the next morning; and (3) that she would have Bill send Hugh a letter documenting the transactions as well. Neither Annita nor Bill ever wrote Hugh the letters outlining the new agreement. Hugh drafted a promissory note stating that Bill and Kandi were to pay Unilda's trust $100,000 at a rate of $1,054.80 per month for the Emma Creek property. Nevertheless, this promissory note was never executed.

When Unilda spoke with Hugh in May 2008, she told him that Bill was still paying her "rent." By August 2010, however, Unilda told Hugh that Bill was no longer paying rent. Unilda decided that she wanted to sue.

Unilda died about 2 weeks later.

*The $100,000 Check*

On March 8, 2007, just 5 days before Annita and Don recorded the Hoover Road property deed and conveyed the Emma Creek property to Bill, Unilda wrote a check to Annita for $100,000. Unilda did not write anything on the memo section of the check. Although there is some disagreement about the date on the check, it is clear that the check was made out sometime in early March 2007 because it was cashed and processed by March 13, 2007. The actual date of the check has no affect on our decision. Despite

7

this fact, we will use the March 8, 2007, date, because several witnesses testified at trial that this was the correct date.

On November 12, 2007, Hugh received a call from Nancy Anderson, Unilda's stepdaughter, about the $100,000 check. Nancy was concerned because Unilda had told her that she had loaned Annita $100,000 because Annita and Don could not obtain a long-term mortgage for "the building."

Hugh's November 26, 2007, notes from his meeting with Unilda stated: "Annita— started paying [Unilda] $400 per month for her $100,000." On August 4, 2008, Unilda told Hugh that Annita was not repaying the $100,000. Over 2 years later, on August 18, 2010, Unilda told Hugh that Annita refused to pay her back for the $100,000 loan and was now claiming that the loan was a gift. Unilda told Hugh that when she told Don that she had not been repaid, he cussed at her. Unilda decided that she wanted to sue Annita.

Unilda died about 2 weeks later.

*Kenneth Files Suit*

On May 6, 2011, Kenneth, acting in his capacity as both the executor of Unilda's estate and successor trustee, sued Bill and Annita. Kenneth alleged that there was an understanding that Bill was supposed to pay Unilda for the Emma Creek property, that Bill recognized this as evidenced by initial payments, and that Bill stopped paying for the house in breach of the agreement. Kenneth further alleged that Bill had obtained title to the Emma Creek property through undue influence. As a result, Kenneth requested that Bill "account for the value of the property he received, less such sums as he can demonstrate that he paid to Mrs. Moffatt, plus interest at the statutory rate." Regarding Annita, Kenneth alleged that Annita had breached her agreement to repay a $100,000

8

loan, requesting that Annita account for the $100,000, plus interest at the statutory amount.

Bill and Annita, who both were represented by Levi Goossen, answered that they did not owe Unilda's estate any money. Bill and Annita asserted that they "fully performed all of their obligations to Unilda."

*Kenneth Decides to Sue for Unjust Enrichment*

On February 14, 2012, Kenneth filed his first pretrial questionnaire. In this questionnaire, Kenneth asserted that Bill had obtained the Emma Creek property through undue influence. Yet, in the alternative, Kenneth also argued that Bill would be unjustly enriched if he were allowed to keep the Emma Creek property. In describing his alternative claim, Kenneth stated:

> "Plaintiff asserts that when Mrs. Moffatt became aware that the Webers conveyed the Emma Creek property to defendant Bill Weber instead of the Trust, as specified in the exchange agreement, Mr. and Mrs. Weber and their son, Bill Weber, relying upon their position of trust and confidence, represented to Mrs. Moffatt that defendant Bill Weber would pay the Trust for the Emma Creek property in order to persuade Mrs. Moffatt not to take action to rescind her conveyance of the Hoover Road property to the Webers or sue them for breach of contract. Plaintiff believes that defendant Bill Weber agreed to these arrangements, and made monthly payments to Mrs. Moffatt and/or the Trust for a time; however, the payments eventually stopped. . . .
> "... [P]laintiff asserts that defendant Bill Weber has been unjustly enriched by virtue of his own actions and those of his parents in relation to this transaction."

Kenneth requested that Bill pay restitution in the amount equal to the value of the Emma Creek property "and/or" the imposition of a constructive trust on the Emma Creek property. Kenneth further requested that "his pleadings be amended to conform to [his new] allegations and causes of actions."

9

On February 13, 2013, Annita died. Bill, in his capacity as executor of her estate, was substituted as a party in her place.

On July 23, 2014, Kenneth filed a revised pretrial questionnaire. Kenneth no longer mentioned his undue influence claim. Regarding the release of the exchange agreement, Kenneth asserted the following:

"[P]laintiff is entitled to equitable relief in order to prevent unjust enrichment of Bill Weber. . . . He must account for the value he received as a result of Mrs. Moffatt's decision to excuse his parents from their obligation to convey the Emma Creek Road property to Mrs. Moffatt, which was based on her reasonable belief and understanding that Bill Weber had agreed to pay her (Mrs. Moffatt) for the Emma Creek Road property, a belief she was reassured by Annita [Weber]'s representations and, plaintiff believes, by Bill Weber himself . . . . Moreover, although Plaintiff denies that the law continues to require a showing of actual or constructive fraud in order to obtain an order and judgment imposing a constructive trust . . . , plaintiff avers (should the Court disagree) that the circumstances surrounding the sequence of events in issue were attended by constructive fraud on the part of all three Webers. A confidential relationship existed between Mrs. Moffatt, on the one hand, and Bill Weber and his parents on the other, and all three took advantage of and breached the trust or confidence each knew Mrs. Moffatt placed in them. [Citation omitted.] It is inequitable to permit Bill Weber to retain the value he received and realized under these circumstances."

On August 20, 2014, at a pretrial conference hearing, Kenneth told the trial court that he was no longer pursuing his undue influence claim against Bill. Instead, Kenneth's attorney stated that they were going to focus on proving unjust enrichment. Furthermore, at this hearing, the parties agreed that the jury would serve in an advisory capacity on the unjust enrichment claim.

On August 28, 2014, Bill responded that Kenneth was required to make some showing of fraud to obtain a constructive trust because this case "involve[d] contractual

10

arrangements between the parties themselves which Unilda bargained for and accepted the benefits."

*Evidence at the Jury Trial*

The jury trial took place between September 23, 2014, and October 2, 2014. Hugh and Unilda's nephew, Ralph Bestvater, testified on Kenneth's behalf. Hugh testified about his dealings with Unilda as his client, including his concerns about Unilda's undocumented financial arrangements with the Webers. Hugh testified that from his working relationship with Unilda, he understood that Bill was supposed to pay Unilda $100,000 for the Emma Creek property and Annita was supposed to repay the $100,000 check she received from Unilda because it was a loan. Hugh's handwritten notes from his meetings with Unilda and the November 2007 formal memorandum were entered into evidence.

Ralph testified that he was present when Unilda made the $100,000 check out to Annita. Ralph explained that when Unilda handed Annita the check, Annita said nothing and then walked away. He explained that he knew the check was for $100,000 because he could see the amount on the check and Unilda told him that the check was for $100,000. According to Ralph, Unilda told him that Annita needed a loan because she was short on money. Ralph testified that Unilda also told him: "If I don't have money that I can help my sister why do I have money for [*sic*]."

Kenneth also testified on his own behalf. Kenneth testified about certain documents belonging to Unilda that he found while serving as executor of Unilda's estate and successor trustee of her trust. Those documents included: (1) Unilda's checks for material and labor on the apartment construction, which totaled $83,544.09; (2) Unilda's check to Annita for $100,000; (3) Unilda's balance sheet indicating that she gave Annita a $100,000 loan for which Annita had not made any payments; (4) Unilda's checks for

11

utilities at the Hoover Road property made after Unilda had already conveyed the property to Annita and Don; and (5) two versions of the exchange agreement, one that was blank and unsigned and another that was signed by Unilda, Annita, and Don, but had lines crossing out the provisions on the first page. Each of those documents were entered into evidence. Moreover, Kenneth explained that based on his conversation with Unilda shortly before her death, he understood that Unilda believed that Bill was supposed to be paying her for the Emma Creek property.

Kenneth also read part of Annita's deposition testimony into evidence, including testimony that Bill might have owed Unilda money for the Emma Creek property.

Bill countered that neither he nor his mother's estate owed any money to Unilda. Bill's theory at trial was as follows: (1) that Unilda gifted the Emma Creek property to him; and (2) that the $100,000 check was for work and improvements Annita and Don had made at the Hoover Road property, including building Unilda's apartment, remodeling the main house, and removing mold from the main house. In support of those theories, Bill testified that Unilda gave him the title to the Emma Creek property free and clear. Bill admitted that his wife, Kandi, had been writing checks to Unilda monthly, but he alleged that those checks were for a separate $10,000 loan. When asked why Kandi had paid Unilda over $12,000 for a $10,000 loan, Bill testified that it must have been a mistake. Regarding the $100,000 check, Bill testified about both the work his parents did for Unilda personally and the work his parents did making structural improvements to the Hoover Road property. Bill asserted that Don spent $93,502 on structural improvements alone. Bill testified that he was not sure why Unilda wrote Annita a $100,000 check but "speculated" that it was for Don's labor. Moreover, Bill's deposition testimony that Unilda delivered the deed of the Emma Creek property to him personally, without ever saying that she expected payment, was read into evidence.

12

Bill read part of Annita's deposition testimony into evidence. According to this deposition testimony, Unilda gave her the $100,000 check for Don's work on Unilda's apartment. Bill also entered into evidence several documents, including a handwritten note allegedly drafted by Unilda and appraisals on the Hoover Road and Emma Creek properties conducted by the Harvey County appraiser's office. The signed handwritten note stated Annita's debts and Bill's debts would be cleared upon Unilda's death. The appraisals showed that the value difference between the Hoover Road property and the Emma Creek property was only $100 when the exchange agreement was drafted in 2005, the properties being worth $143,600 and $143,500, respectively.

*Jury Instruction Conference*

At the jury instruction conference, Kenneth's attorney requested instructions on constructive fraud. In explaining why he wanted the constructive fraud instructions, Kenneth's attorney stated that he had "mixed feelings" but wanted the instructions just in case he was misinterpreting the holdings in *Nelson v. Nelson*, 288 Kan. 570, 580, 205 P.3d 715 (2009), and *Estate of Draper v. Bank of America*, 288 Kan. 510, 534-35, 205 P.3d 698 (2009), which he correctly believed allowed the creation of a constructive trust without proof of fraud. Kenneth's attorney also pointed out that in the latest pretrial questionnaire, Kenneth argued that Annita and Don had procured their release from the exchange agreement based on constructive fraud. Bill's attorney agreed that the constructive fraud instructions were appropriate. Kenneth's attorney requested, and was then granted, the following jury instruction:

> "Mr. Walsh contends that at some point prior to November 26, 2007 Mrs. Moffatt excused Annita and Donald Weber from performing what he contends was a contractual obligation to convey the property they owned on Emma Creek Road to Mrs. Moffatt. Mr. Walsh contends that Mrs. Moffatt excused the Webers from performing based on her belief that Bill Weber would pay her $100,000 for the property on Emma Creek Road. Mr. Walsh contends that Mrs. Moffatt was encouraged and reassured in her

13

belief that Bill Weber would pay for the property on Emma Creek Road by Annita Weber, who acknowledged Bill Weber's obligation to pay for the property in multiple conversations. Mr. Walsh contends that Mrs. Moffatt's decision to excuse Annita and Donald Weber from performing what he contends was [a] contractual obligation to convey the Emma Creek property to her trust was procured by constructive fraud. He further contends that Bill Weber will be unjustly enriched if he is not required to pay Mrs. Moffatt's Trust an amount equal to the value he received as a result of Mrs. Moffatt's decision."

Thus, Kenneth argued that Bill would be unjustly enriched if he were allowed to retain the Emma Creek property without payment *because Annita procured the conveyance via constructive fraud* by reassuring Unilda that Bill would make payments for the property.

*Findings and Rulings*

The trial court held Bill personally liable to Unilda's estate in the amount of $100,000 plus postjudgment interest at the statutory judgment rate starting on October 2, 2014. The trial court also granted Kenneth's request that the Emma Creek property be placed in constructive trust as "ancillary relief" to the personal money judgment against Bill. In granting this request, the trial court stated:

"In this case, the jury made unanimous findings that Bill Weber would be unjustly enriched if he[] was permitted to retain the property on Emma Creek Road without paying for it. The [jury] also unanimously found that Annita Weber had engaged in constructive fraud by keeping the Emma Creek Road property without compensation to Mrs. Moffatt . . . .

"Though Bill Weber may not himself have been the person who committed the constructive fraud in this case, it is clear that he will benefit from the jury-determined fraud if he is allowed to keep the Emma Creek property without compensation to the

14

Moffatt estate. As the transferee of the property, he stands in the shoes of the one who committed the fraud . . . .

"Having considered the verdicts of the jury in this case, in light of the Court's own additional findings, the Court finds that the plaintiff should be entitled to have a constructive trust imposed on the Emma Creek Road property in plaintiff's favor."

For the breach of oral contract claim, the trial court ordered

"that judgment should be and is hereby entered in favor of plaintiff and against Bill Weber in his capacity as Executor of the Estate of Annita L. Weber, deceased, in the amount of $100,000 plus prejudgment money interest at the statutory rate from and after May 6, 2011 (the date on which this action was commenced), plus post-judgment at the statutory rate from and after October 2, 2014."

## *Does Kenneth Have Standing to Bring His Claims?*

On appeal, Bill first argues that Kenneth lacks standing to sue because provision 8.04 of Unilda's revocable trust agreement prevents him from challenging Unilda's financial decisions. Kenneth counters that Bill has misinterpreted the meaning of provision 8.04.

### *Standard of Review*

"Standing is a jurisdictional question whereby courts determine 'whether the plaintiff has alleged such a personal stake in the outcome of a controversy as to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on his or her behalf.'" *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750-51, 189 P.3d 494 (2008) (quoting *Moorhouse v. City of Wichita*, 259 Kan. 570, 574, 913 P.2d 172 [1996]). "Because standing implicates the court's jurisdiction to hear a case, the existence of standing is a question of law over which this court's scope of review is unlimited."

*Board of Sumner County Comm'rs*, 286 Kan. at 751. If a party lacks standing to bring a claim, then the reviewing court lacks jurisdiction to consider that claim. See 286 Kan. at 750-51.

### *Did Kenneth Have Standing to Sue?*

Bill's argument turns on the language of provision 8.04 of Unilda's revocable trust agreement. Provision 8.04 states in relevant part: "Any successor Trustee shall accept, without examination or review, the accounts rendered and the property delivered by or from a predecessor Trustee, without incurring any liability or responsibility for doing so." Bill asserts that this provision means that Kenneth, as a successor trustee, cannot investigate Unilda's prior financial decisions. This includes Unilda's decisions to "excus[e] the Webers from deeding the Emma Creek road property to her trust and authorizing Don and Annita to deed it to Bill Weber and the giving of the $100,000 check for payment for construction labor to Annita."

To support his contention, Bill cites *Vanier v. Hale*, No. 76,144 (Kan. App.) unpublished opinion, filed July 18, 1997. In *Vanier*, Lesta Vanier created a trust that included three separate and distinct shares designated for her three children, John, Jerry, and Joyce. During her lifetime, the child of the designated share, along with two persons of that child's choosing, and Lesta, acted as trustee for each respective share. Lesta's trust dictated that the trust property be divided between the three children through these shares upon her death.  Before her death, however, Lesta made financial decisions that decreased the value of the property in John's and Jerry's shares while increasing the value of property in Joyce's share.

John and Jerry sued to recover losses, arguing that Joyce engaged in self-dealing that resulted in Lesta making financial decisions that hurt their interests. Nevertheless, the *Vanier* court rejected this argument because "[a]s settlor, sole beneficiary, and co-trustee,

16

[Lesta] had the power to alter, amend, or terminate the Trust at any time for any reason regardless of whether the purposes of the trust had been accomplished." Slip op. at 22. In reaching its decision, the *Vanier* court noted that in other cases, like *Florida Nat'l Bank of Palm Beach County v. Genova*, 460 So. 2d 895 (Fla. 1958), courts have been hesitant to reverse decisions made by a settlor and sole beneficiary of a trust regardless of undue influence unless there is proof of physical or mental incapacity. In essence, because all parties agreed that Vesta willingly and competently made her financial choices, John and Jerry were barred from suing Joyce for self-dealing.

Yet, this case and the *Vanier* case are distinguishable. Here, Kenneth's claims involve determining the nature of the financial decision Unilda made during her life, that is, did Unilda expect payment for the conveyance of the Emma Creek property and repayment for the $100,000 check? Kenneth believes Unilda expected payment and repayment, and he is therefore suing to uphold, not reverse, Unilda's financial decisions. This conclusion is further supported by Hugh's notes and testimony that Unilda asked Hugh to initiate a lawsuit against the Webers shortly before her death.

Moreover, Bill's argument that Kenneth lacks standing to sue fails for three other reasons. First, this court has held that "[a]s real parties in interest, successor trustees have standing to bring an action on behalf of the trust." *Ford v. Willits*, 9 Kan. App. 2d 735, Syl. ¶ 1, 688 P.2d 1230 (1984), *aff'd* 237 Kan. 13, 697 P.2d 834 (1985). Second, under Unilda's trust agreement, a successor trustee has identical "rights, titles, powers and privileges" as the original trustee. Unilda, as the original trustee, had "all powers and authority available at common law or any statutory authority under the laws of the State of Kansas." Third, K.S.A. 59-1401 gives the executor or administrator of a decedent's estate the duty to marshall assets belonging to the estate. Thus, Unilda had, and Kenneth has, the power to "prosecute or defend an action, claim or judicial proceeding in any jurisdiction to protect trust property and the trustee in the performance of the trustee's duties" as stated in K.S.A. 58a-816(24).

17

In summary, Bill's argument fails because Kenneth clearly had standing to sue as Unilda's successor trustee.

*Were Kenneth's Claims Barred Under the Statute of Limitations?*

On appeal, Bill argues that Kenneth's unjust enrichment claim and breach of oral contract claim were time-barred under the statute of limitations. Kenneth responds that he timely pled both his unjust enrichment claim and breach of oral contract claim. Kenneth also asserts that Bill bases his statute of limitations arguments on inapplicable laws and twisted facts.

*Standard of Review*

An appellate court "has unlimited review over the interpretation and application of a statute of limitations." *Anderson Office Supply v. Advanced Medical Assocs.*, 47 Kan. App. 2d 140, 146, 273 P.3d 786 (2012). Nevertheless, in rare instances where there are factual disputes as to when the cause of action accrued, this court has recognized that such an issue constitutes a question of fact. See *Bold v. Spitcaufsky*, 24 Kan. App. 2d 135, 142-43, 942 P.2d 652 (1997). This court reviews factual findings for substantial competent evidence. *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014). Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Gannon*, 298 Kan. at 1175.

*Applicable Law*

The statute of limitations for unjust enrichment is 3 years. K.S.A. 60-512. The statute of limitations for an unjust enrichment claim begins to run when all of the elements of unjust enrichment are present. *Estate of Draper*, 288 Kan. at 534. This

18

generally means that the statute of limitations begins to run the moment the retention of property becomes unjust. *Estate of Draper*, 288 Kan. at 534.

The statute of limitations for a breach of an oral contract is 3 years. K.S.A. 60-512(1). In *Longhofer v. Herbel*, 83 Kan. 278, Syl. ¶ 1, 111 P. 483 (1910), our Supreme Court held that if there is an understanding that the borrower will be using the money over an indefinite period of time, then the statute of limitations does not begin to run until a demand is made.

*Additional Facts*

The first time Bill raised a statute of limitations argument was in his supplemental answer filed in October 2013. In this supplemental answer, Bill stated: "There is no allegation of any agreement in writing under which plaintiff claims a cause of action. The statute of limitations has expired on all of the plaintiff's claims."

On July 7, 2014, within his second amended pretrial questionnaire, Bill moved to dismiss all of Kenneth's claims because the claims were contractual claims that were barred under K.S.A. 60-511's 5-year statute of limitations for written contracts and K.S.A. 60-512's 3-year statute of limitations for oral contracts.

On August 20, 2014, Kenneth told the trial court that he would be pursuing his alternative claim of unjust enrichment instead of a claim of undue influence.

On September 3, 2014, Bill filed a "motion to dismiss in limine," arguing that both of Kenneth's claims were time-barred under the statute of limitations. Bill argued:

> "[T]he statute of limitations [had] expired on the alleged agreement and on claims arising under the agreement under K.S.A. 60-511. Any cause on the exchange agreement accrued

19

on March 14, 2005, when it was signed and the exchange of deed for the Emma Creek property was not given, and expired on March 14, 2010, and that any alleged equitable lien on the Emma Creek property is likewise barred."

Bill further argued that the breach of oral contract claim on the $100,000 loan must be dismissed for the following reason:

"[I]f there [was] a loan there is nothing in writing to document the payment to Annita Weber as a loan . . . . This was a voluntary payment as to which no terms of repayment exist and any cause of action for refund would of necessity accrue when the alleged original loan payment was made. There was no demand for payment and no partial payment. To the extent that Annita and Don Weber have allegedly failed to meet their obligations the statute of limitations has expired on the alleged oral contract under K.S.A. 60-512 on March [8], 2010[," three years after Unilda wrote the check]."

On September 13, 2014, the trial court entered a pretrial conference order. The pretrial order detailed that Bill was alleging the statute of limitations as an affirmative defense based on the same arguments detailed in his September 3, 2014, "motion to dismiss in limine." The pretrial order provided no further explanation concerning the reasoning behind Bill's arguments.

During the September 17, 2014, pretrial hearing, Bill's attorney raised the statute of limitations argument again. Kenneth's attorney responded that Bill's attorney should have challenged the statute of limitations earlier than a week before the trial. Bill's attorney responded that he should be allowed to challenge the statute of limitations despite the trial being about a week away because Kenneth's attorney abandoned his undue influence claim "chang[ing] his entire theory of liability . . . [to] unjust enrichment, a whole different broad theory based on contract . . . ." The trial court responded that it did not "see this as a matter that[] [was] properly before the Court right now" and that the contract claim had "been out on the table for quite some time." The trial court also stated

20

that it was inclined to deny the motion because as a "motion to dismiss in limine" it was not procedurally correct. The trial court decided that it would reserve its ruling on the statute of limitations arguments until it had heard the evidence at trial.

During the jury trial, after Bill's defense rested, Bill reargued that Kenneth's claims were time-barred. In support of this argument, Bill filed a written memorandum. Regarding the statute of limitations, the memorandum stated:

"[T]he theory of plaintiff's claim is that there was a breach of contract by the Webers on or about March 14, 2005. The agreement was in writing, so the five year statute of limitations applies and the plaintiff's claim of breach is barred by [the] statute of limitations. K.S.A. 60-511.

"The $100,000 was paid to the Webers pursuant to agreement to take case of Unilda the rest of her life, but the theory of the plaintiff is that it was a loan. There is nothing in writing as to any repayment terms and no oral agreement for repayment on plaintiff's theory. It has to be treated as money inadvertently or improvidently loaned for purposes of the statute of limitations. It was therefore subject to immediate refund and the statute of limitations started to run on March [8], 2007, when the $100,000 was paid. Since there is nothing in writing, the three year statute of limitations under K.S.A. 60-512 timed out on March [8], 2010."

The trial court denied the motion. In doing so, the trial court did not explain why it denied Bill's argument that Kenneth's first claim for unjust enrichment was barred based on the 5-year statute of limitations for a written contract. Regarding the breach of oral contract claim, citing *Longhofer*, the trial court ruled Kenneth's breach of oral contract claim was the type of claim that did not accrue for statute of limitations purposes until a demand for payment had been made. The trial court explained that it would ask the jury about when or if a demand for payment was made; if the jury found that Unilda demanded payment on the $100,000 check within 3 years of Kenneth bringing suit, then Kenneth had timely brought the claim. The jury found that Unilda demanded repayment

21

of the $100,000 check on August 18, 2010, which was approximately 9 months before Kenneth filed his action.

*Was Kenneth's Unjust Enrichment Claim Time-barred by the Statute of Limitations?*

Bill's argument about Kenneth's claim against him for unjust enrichment is very confusing. In essence, Bill ignores that Kenneth sued him because he allegedly obtained title to the Emma Creek property only after Annita secured the conveyance through constructive fraud. Instead, Bill challenges claims that Kenneth has not pleaded. Specifically, Bill argues: (1) that Kenneth's unpleaded claim for Annita and Don's breach of the original exchange agreement was untimely; and (2) that Kenneth's unpleaded claim for Bill's breach of an oral contract to make payments to Unilda for the Emma Creek property was untimely. In making those arguments, it seems that Bill does not recognize that unjust enrichment claims and contract claims were not interchangeable. In his brief, Bill contends that the earliest he could have moved to dismiss under the "contract theories" was after Kenneth abandoned his undue influence claim and shifted to unjust enrichment.

The ultimate result is that Bill has made a straw man argument. "A straw man argument is where the arguer wishes to respond to an argument of his or her choosing and not one that is actually presented." *State v. Smith*, No. 107,447, 2013 WL 1688924, at *3 (Kan. App. 2013) (unpublished opinion), *rev. denied* 298 Kan. 1207 (2013). Here, Kenneth's claim was for unjust enrichment, not for Annita and Don's breach of the exchange agreement or Bill's breach of an oral contract to pay for the Emma Creek property. Thus, any argument Bill has made regarding claims that Kenneth has not pleaded is fatally flawed.

22

Moreover, by failing to address Kenneth's actual claim for unjust enrichment, Bill has abandoned any argument he might have been able to make about Kenneth's unjust enrichment claim being time-barred. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (holding that an issue not briefed is deemed waived and abandoned). It is also important to point out that Bill made the same arguments before the trial court that he is raising now. For example, Bill argued before the trial court that Kenneth's unjust enrichment claim was time-barred based on the written contract and the breach of oral contract statute of limitations standards. It is a well-known rule that "[t]he defense of the statute of limitations is an affirmative defense that must be pleaded and proved by one who asserts it." *Diversified Financial Planners v. Maderak*, 248 Kan. 946, 948, 811 P.2d 1237 (1991). The failure to raise an affirmative defense before the trial court waives that defense on appeal. *Diversified Financial Planners*, 248 Kan. at 948. In turn, Bill's failure to challenge Kenneth's actual pleaded claim—that Bill was unjustly enriched because he obtained title to the Emma Creek property through his mother's constructive fraud—further precludes relief because he failed to plead or prove such an argument as an affirmative defense. See also *Limestone Farms, Inc. v. Deere & Company*, 29 Kan. App. 2d 609, 615, 29 P.3d 457 (2001) (holding that because statute of limitations issues are not jurisdictional but affirmative defenses, courts cannot raise a statute of limitations issue *sua sponte*; courts that raise an affirmative defense not pled *sua sponte* commit error).

Finally, the trial court never actually addressed Bill's arguments concerning why Kenneth's unjust enrichment claim was time-barred under the statute of limitation rules for written contracts and oral contracts. Our Supreme Court has held:

> "[A] litigant must object to inadequate findings of fact and conclusions of law in order to give the trial court an opportunity to correct them. In the absence of an objection, omissions in findings will not be considered on appeal. Where there has been no such

objection, the trial court is presumed to have found all facts necessary to support the judgment." *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998).

As a result, even if Bill's arguments on appeal were valid, he would not be entitled to relief because he failed to prevail on the trial court to respond to his argument that Kenneth's unjust enrichment claim was time-barred under the statute of limitations for written and oral contracts.

*Was Kenneth's Breach of Oral Contract Claim Time-Barred by the Statute of Limitations?*

Next, Bill argues that Kenneth's claim that Annita breached the oral contract to repay the $100,000 check was untimely. In making this argument, Bill spends a great deal of time arguing about hearsay and reweighing facts that are irrelevant for statute of limitations purposes. Ignoring these arguments, focusing solely on the arguments concerning the statute of limitations, it is readily apparent that Bill has failed to establish that Kenneth's breach of oral contract claim was time-barred.

The entirety of Bill's statute of limitations argument centers on his belief that if Unilda lent Annita $100,000, the $100,000 loan was a payable on demand loan. Bill cites *Wooster v. National Bank of America*, 139 Kan. 429, 430-31, 32 P.2d 235 (1934), for the proposition that "[a]n obligation for the payment of money on demand is due at once, and the statute starts to run then." This rule is an exception to the general rule that when a performance is promised in the terms "on demand," a demand must be made as a condition prececent to the enforcement of the promise. Under this general rule, the statute of limitations begins to run from the date of demand. See 8 Corbin on Contracts, Conditions § 31.5 (Rev. ed. 1999).

24

Nevertheless, based on the "on demand" language in *Wooster* and the language in *Douglass v. Sargent & Bro*, 32 Kan. 413, 4 P. 861 (1884), Bill argues that the statute of limitations for any breach of the oral contract began to run on March 8, 2007, the date of Unilda's check to Annita for $100,000. Thus, Bill argues that the 3-year statute of limitations under K.S.A. 60-512(1) to bring Kenneth's breach of an oral contract claim expired on March 8, 2010, over a year before the petition in this case was filed.

On the other hand, we note two major problems with Bill's argument. First, Bill's argument that Unilda's check for $100,000 was an on-demand loan is conclusory. Bill's entire application of law to fact, however, consists of 24 words: "If there was an obligation here it was due immediately without demand and legal action for recovery could have been filed immediately without demand." This application is totally conclusory: Bill sets out his conclusion without giving us a single reason why we should accept it as true. Conclusory arguments are deemed abandoned on appeal. *RAMA Operating Co. v. Barker*, 47 Kan. App. 2d 1020, 1036, 286 P.3d 1138 (2012). Thus, by making a conclusory argument, Bill has abandoned any argument that the breach of oral contract claim against Annita was untimely.

Second, Bill's argument begs the question, which occurs when an argument either implicitly or openly is expressed in one of the premises. For example, one of Bill's premises, which we quoted earlier, states: "If there was an obligation here it was due immediately without demand and legal action for recovery could have been filed immediately without demand." To characterize the obligation as "due immediately without demand" is to say that the obligation was a promise to pay money on demand. The premise offered to sustain the conclusion vaguely implies it, but no independent evidence for the premise is offered: that Annita promised to pay a money debt already due and payable. Thus, we are left with no independent evidence for the claim made in both the conclusion and the premise.

25

Because Bill has failed to raise any other arguments regarding why the breach of oral contract claim was untimely, he has abandoned any statute of limitations arguments that might have been available on appeal. See *Superior Boiler Works*, 292 Kan. at 889 (holding an issue not briefed is abandoned). Moreover, any alternative argument Bill might have had would also fail to comply with the rule that affirmative defenses, including statute of limitations arguments, must be pled and proved; see *Limestone Farms, Inc.*, 29 Kan. App. 2d at 615, and the rule that arguments not within a pretrial order are not preserved. *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, Syl. ¶ 8, 61 P.3d 68 (2002).

*Did the Trial Court Abuse Its Discretion?*

Bill next argues that the trial court abused its discretion in a variety of ways over the course of this case. In this section of his brief, Bill jumps from issue to issue, listing a string of different rulings that he believes constituted an abuse of the trial court's discretion. Kenneth points out in his brief that Bill has abandoned any argument he may have had in failing to explain how the trial court's actions constituted an abuse of discretion and in failing to cite caselaw in support of his position. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013) (holding a point raised incidentally in a brief and not argued therein is abandoned).

Moreover, from the arguments, which we can decipher, it is clear that the trial court did not abuse its discretion. It seems that Bill's primary complaints can be placed into two categories: (1) that Judge Walker ruled against him on many issues; and (2) that Kenneth was allowed to abandon his claim of undue influence and proceed on a claim of unjust enrichment shortly before the jury trial. Nevertheless, "[a]dverse legal rulings alone cannot form the basis for a recusal." *State v. Sawyer*, 297 Kan. 902, 908, 305 P.3d 608 (2013). Moreover, Kenneth first raised his unjust enrichment claim as an alternative to his undue influence claim in his pretrial questionnaire filed in February 2012. As a

result, Bill was put on notice that Kenneth might rely on his claim of unjust enrichment well before the trial in September and October 2014. Finally, a shift from one available remedy to another will be allowed unless it would work a hardship on the other party. Bill has not shown that Kenneth's shift from his undue influence claim to his unjust enrichment claim worked a hardship on him.

In summary, we determine that Bill's hodge-podge arguments concerning alleged abuses of discretion have been abandoned.

*Did the Trial Court Admit Inadmissible Hearsay Into Evidence?*

Next, Bill argues that the trial court's rulings should be reversed because it admitted inadmissible hearsay into evidence. Bill focuses on two different statements that he believes constituted inadmissible hearsay. First, Bill argues that Ralph's testimony "that the $100,000 was a loan" constituted inadmissible hearsay. Second, Bill argues that Hugh's notes from his meetings with Unilda, including Unilda's statements that she had loaned Annita $100,000 and that Annita had refused to repay the loan, constituted inadmissible hearsay. Kenneth responds that Bill's hearsay arguments concerning Ralph's statements were not preserved for review on appeal.

*Standard of Review*

Our Supreme Court has explained an appellate court's standard for reviewing the trial court's admission of evidence as follows:

> "'Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. [Citation omitted].'"

27

*Mooney v. City of Overland Park*, 283 Kan. 617, 620, 153 P.3d 1252 (2007) (quoting *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 [2006]).

When reviewing the admissibility of statements under hearsay exceptions outlined in K.S.A. 2015 Supp. 60-460, an appellate court reviews the trial court's rulings for an abuse of discretion. See *State v. Seacat*, 303 Kan. 622, 635, 366 P.3d 208 (2016); *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). A trial court "abuses its discretion when: (1) no reasonable person would take the view adopted by the trial judge; (2) the ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion was made." *Wiles*, 302 Kan. at 74.

*Did Bill Preserve His Argument Concerning Ralph's Testimony?*

Bill takes issue with Ralph's testimony that the $100,000 check to Annita was a loan. Bill argues that Ralph's "statement was not made in good faith and was [made] with incentive to falsify and distort, Ralph [] being one of Unilda's heirs and trust beneficiaries." Bill further argues that Ralph's statement was offered for the truth of the matter asserted.

Kenneth responds that Bill is not entitled to relief because he is raising his objection to Ralph's testimony for the first time on appeal. An appellate court cannot consider a trial court's erroneous admission of evidence "unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404. Even if a party filed a pretrial objection, that party must make a contemporaneous objection at trial. See *State v. Holman*, 295 Kan. 116, 126-27, 284 P.3d 251 (2012).

Bill asserts that he preserved his hearsay argument because (1) he moved in limine to exclude this evidence before trial, and (2) he made a continuing objection to the evidence during trial. Bill's arguments, however, are misleading. First, Bill's motion in limine did not request the exclusion of Ralph's testimony based on inadmissible hearsay. He requested that only Hugh's testimony and Sylvia Kelly's testimony concerning statements Unilda had allegedly made be deemed inadmissible hearsay.

Second, when Ralph testified on the first day of trial, Bill made no objections. In fact, Bill did not object to anything during Ralph's testimony let alone Ralph's testimony concerning Unilda's $100,000 loan to Annita. The only objection Bill made on the first day of trial was that Kenneth should not be able to testify about Unilda's handwritten balance sheet, indicating that she had loaned Annita $100,000. When Bill's attorney objected, he simply stated, "I object to all of this." The trial court responded, "I'll treat it as a continuing objection."

The places Bill cites as evidence of his continuing objection did not include the objection lodged during Kenneth's testimony about Unilda's handwritten balance sheet. Instead, Bill cites objections made on the third and sixth day of the trial, well after Ralph's testimony on the first day of trial. The appealing party has the burden to designate a record showing that his or her claim has merit; without such a record, a party's claim necessarily fails. *Friedman*, 296 Kan. at 644-45. Bill has failed to cite a place in the record showing that he objected to Ralph's testimony unequivocally. As a result, this precludes Bill from challenging Ralph's testimony on appeal.

*Were Hugh's Notes Admissible Under the Business Records and Necessity Exceptions to Hearsay?*

Next, Bill argues that Hugh's notes about Unilda lending Annita $100,000, Annita not repaying the loan, and Unilda considering suing Annita for not repaying the loan

29

constituted inadmissible hearsay as the notes did not fall under the business records exception or the necessity exception. Kenneth counters that the trial court correctly admitted Hugh's notes under those exceptions.

At trial, Kenneth moved to admit Hugh's notes located in Plaintiff's Exhibit 22 under the business records exception to hearsay and the necessity exception to hearsay. Although the trial court did not explicitly state why it was admitting Hugh's notes, it seems that it did so under the business records exception and the necessity exception given that this was Kenneth's bases for introduction of Hugh's notes into evidence. Bill's attorney objected to the admission of Hugh's notes.

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible." K.S.A. 2015 Supp. 60-460. Two exceptions to this general rule are the business records exception and the necessity exception. K.S.A. 2015 Supp. 60-460(m), the business record exception, states:

> "Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, [are admissible] if the judge finds that (1) they were made in the regular course of a business at or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness."

K.S.A. 2015 Supp. 60-460(d)(3), the necessity exception, states that a statement made by an unavailable declarant may be admissible if

> "the judge finds [the statement] was made . . . by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

In this case, Hugh's notes require a double hearsay analysis because the notes constituted out-of-court statements and Unilda's alleged statements within those notes constituted out-of-court statements. Hugh testified that he made the notes in the regular course of business. Hugh further testified that the notes simply recorded what was discussed during his meetings with Unilda. Thus, there was no reason to question the accuracy or trustworthiness of his notes.

The larger issue was whether Unilda's statements within those notes were admissible under the necessity exception to hearsay. Our Supreme Court has explained that trial courts have great discretion in admitting statements under the necessity exception. *Seacat*, 303 Kan. at 635. This court will generally defer to the trial court's ruling because this court is in no better position than the trial court to determine if the unavailable witness had an incentive to falsify or distort. *Seacat*, 303 Kan. at 635. The presence or absence of an incentive to falsify or distort is determined by looking at the totality of the circumstances. *Seacat*, 303 Kan. at 635.

Here, when Unilda and Annita had a falling out, there was reason to question the veracity of Unilda's statements to Hugh about the check being a loan and Annita's refusal to repay the loan. Yet, there was no reason to question the veracity of Unilda's earlier statements to Hugh before any disharmony began between Unilda and Annita. Indeed, Unilda told Hugh that the $100,000 check was a loan shortly after she wrote the $100,000 check in March 2007. For instance, according to Hugh's notes, at his and Unilda's November 27, 2007, meeting, Unilda told him that Annita started paying her "$400 per month for her $100,000[*sic*]." During that same time period, Unilda requested an amendment to her revocable trust agreement to include a gift of real property to Annita and appoint Annita as her successor trustee.

Those facts clearly showed that Unilda and Annita were getting along when she first told Hugh that the check was a loan. Moreover, if Unilda had not been getting along

31

with Annita, she probably would not have favored Annita in those amendments to her trust. Finally, the first time Unilda complained about Annita not repaying the loan did not occur until August 2008.

Thus, while Hugh's notes taken after Unilda and Annita's falling out were less trustworthy, Hugh's earlier notes stating that the $100,000 check was a loan does not have that same taint. In other words, given that Unilda and Annita were not out of favor with each other when Unilda first told Hugh about the loan, Unilda would have unlikely provided false information about the loan then. Because there was evidence that Unilda's initial statements were made in good faith, Hugh's notes were properly admitted under the necessity exception.

Moreover, we note that even if the trial court erred by admitting Hugh's notes into evidence, the error was harmless. The erroneous admission of evidence is subject to the harmless error standard. See K.S.A. 2015 Supp. 60-261. "Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order." K.S.A. 2015 Supp. 60-261.

Here, there were two reasons why the admission of the notes were harmless. First, Bill's primary issue with the admission of Hugh's notes was that they included statements that the $100,000 check was a loan. Yet, as discussed earlier, the same evidence came in through Ralph's testimony without objection. Consequently, the admission of Hugh's notes was harmless because the same evidence came in through another witness' testimony without objection.

Second, although Kenneth has not raised this issue in his brief, Bill admitted the same information he complains about into evidence through another exhibit. Bill complains that Hugh's notes located in Plaintiff's Exhibit 22 constituted inadmissible

hearsay. Nevertheless, Bill moved to admit Plaintiff's Exhibit 22A into evidence. Plaintiff's Exhibit 22A consisted of other notes written by Hugh about his and Unilda's meetings. In admitting Plaintiff's Exhibit 22A, Bill's attorney focused on the first page of the exhibit, which involved Hugh's notes that Unilda was satisfied with the current provisions of her amended trust and "ha[d] already taken care of the Webers."

> Page 3 of Plaintiff's Exhibit 22A, however, contains the following notes:
> "Remove Don & Annita as primary fiduciary[.]
> "Loaned Don & Annita $100K—not repaid . . . not comfortable /s/ any documents [*sic*]."

Accordingly, through Exhibit 22A, one not only learns that Unilda asserted that the $100,000 was a loan but also learns that Annita and Don were not repaying that loan. As a result, any error that resulted from the admission of Hugh's notes in Plaintiff's Exhibit 22 was harmless because Bill admitted the same information he complains about into evidence through other notes written by Hugh. See *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1203, 308 P.3d 1238 (2013) (holding that parties who invite error below cannot complain about that error on appeal).

*Did the Trial Court Err by Refusing to Grant Bill's Request for Certain Jury Instructions?*

Next, Bill makes several arguments regarding jury instruction errors. Specifically, Bill argues: (1) that the trial court erred by denying his request for an instruction that the handwritten note allegedly written by Unilda, forgiving the Webers' debts upon her death, was a legally enforceable contract; (2) that the trial court erred by denying his request for an instruction that a successor trustee shall accept the financial decisions of the original trustee; (3) that the trial court erred by denying his request for an instruction about what Unilda believed was not in evidence; (4) that the trial court erred by denying his request

for an instruction on equity; and (5) that the trial court erred by giving jury instruction 10, which involved the elements of unjust enrichment.

*Standard of Review*

When reviewing jury instruction issues, an appellate court engages in the following four-step analysis:

> "'[T]he progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S.Ct. 1594 (2012).' [Citation omitted]" *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

*Did the Trial Court Err When It Refused to Instruct the Jury That the Handwritten Note Was an Enforceable Contract?*

Bill contends that the trial court should have granted his request for the following instruction: "The unwritten [*sic*] handwritten memorandum signed by Unilda Moffat and Annita Weber is an enforceable agreement for disposition of property at death." Nevertheless, "'[t]he function of instructions is to advise the jury with respect to the law governing all issues joined by the pleadings upon which evidence is adduced and to advise the jury regarding the verdicts it is possible to render on the evidence actually adduced.'" *Hollinger v. Stormont Hosp. & Training School for Nurses*, 2 Kan. App. 2d

302, 307, 578 P.2d 1121 (1978). Bill's instruction was improper because the existence or nonexistence of a contract or agreement raised an issue of fact for the jury. Here, Bill's instruction told the jury to skip its first task, which was to resolve the issue of fact, and directed the jury to determine that the handwritten memorandum was an enforceable contract. This instruction was clearly improper. Accordingly, the trial court did not err by denying Bill's request.

*Did the Trial Court Err When It Refused to Instruct the Jury Concerning Kenneth's Standing to Sue?*

Next, Bill argues that the trial court erred by denying two instructions concerning his interpretation of provision 8.04 of Unilda's revocable trust. Bill essentially repeats his argument that Kenneth does not have standing to sue, further asserting that the trial court should have instructed the jury that Kenneth lacked standing based on provision 8.04. Nevertheless, as previously discussed, Bill's arguments regarding Kenneth's standing to sue based on provision 8.04 are baseless.

*Were Bill's Remaining Jury Instruction Complaints Immaterial?*

Bill's remaining jury instruction requests are specifically tied to Kenneth's unjust enrichment claim. To contradict the evidence that Unilda believed Bill would pay her for the Emma Creek property, Bill argues that the trial court should have given an instruction that "what Unilda believed was not evidence." Bill further argues that there should have been an instruction on equity. Finally, Bill argues that the trial court erred by giving the instruction reciting the elements of unjust enrichment.

Nevertheless, the jury served in an advisory capacity on Kenneth's equitable claim of unjust enrichment. As Kenneth notes in his brief, when the jury serves in an advisory capacity, the trial court's ultimate findings and rulings are separate from those of the jury.

In *In re Estate of Roberts*, 192 Kan. 91, 99, 386 P.2d 301 (1963), our Supreme Court addressed an identical issue. In determining that jury instructions to an advisory jury were immaterial, our Supreme Court explained:

> "The appellant complains of certain specified instructions given to the jury, contending they had a tendency to mislead a lay jury. In the instant case the jury was only serving in an advisory capacity and its findings were thus only advisory. Under such circumstances, the findings made by a trial court are independent findings made upon a consideration of the same evidence presented to the jury. Errors, if any, made by the trial court in giving instructions to an advisory jury are immaterial." 192 Kan. at 99.

Consequently, Bill's remaining jury instruction challenges fail because if there were errors, those errors were immaterial.

*Did the Trial Court Err by Finding That Bill was Unjustly Enriched?*

Next, Bill makes three arguments why the trial court erred in finding that he was unjustly enriched. First, Bill argues that he could not have been unjustly enriched given that Unilda gifted him the Emma Creek property. Second, Bill contends that substantial competent evidence did not support the trial court's finding that Annita committed constructive fraud. Third, Bill asserts that he could not have been unjustly enriched given that Unilda "had nothing more than an expectation" of payment. Based on the preceding arguments, Bill asks this court to reverse the trial court's unjust enrichment finding. Kenneth counters that he could sue Bill for unjust enrichment and that substantial competent evidence supported the trial court's finding.

*Standard of Review*

An appellate court's review over a trial court's unjust enrichment finding has two steps. First, an appellate court examines the trial court's factual findings for substantial

36

competent evidence. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009); see *Haile Group, LLC v. City of Lenexa*, No. 102,319, 2010 WL 4977221, at *10 (Kan. App. 2010) (unpublished opinion). After determining that the factual findings are supported by substantial competent evidence, an appellate court has de novo review over the trial court's conclusion that a defendant was unjustly enriched. See *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 176-77, 910 P.2d 839 (1996).

*Applicable Law*

"To establish an unjust enrichment claim, a plaintiff must establish (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust." *University of Kansas Hosp. Auth. v. Board of Waubaunsee County Comm'rs*, 299 Kan. 942, 960, 327 P.3d 430 (2014). Our Supreme Court has explained the doctrine of unjust enrichment as follows:

> """Quantum meruit is an equitable doctrine. 'Restitution and unjust enrichment are modern designation for the older doctrine of quasi-contracts.' [Citation omitted.] 'The theory of quasi-contract is raised by the law on the basis of justice and equity regardless of the assent of the parties.' [Citation omitted.] 'The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him [or her].' [Citations omitted.]""" *Haz-Mat Response, Inc*., 259 Kan. at 176.

Again, Kenneth argued that Bill should be held liable for unjust enrichment because he obtained title to the Emma Creek property by means of Annita's constructive fraud. Kenneth's argument can be summarized as follows: (1) Annita and Don conveyed the Emma Creek property to Bill; (2) Bill appreciated and had knowledge of the conveyance; and (3) it would be unjust if he were allowed to retain the Emma Creek property because Annita procured the conveyance of the Emma Creek property to Bill by

way of constructive fraud, reassuring Unilda that Bill would make payments for the property.

Constructive fraud is

"'''a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty [n]or purpose or intent to deceive is necessary.'" [Citation omitted.] Two additional elements must also be proven to establish constructive fraud: (1) a confidential relationship, and (2) a betrayal of this confidence or a breach of a duty imposed by the relationship. [Citation omitted.]'" *Nelson v. Nelson*, 288 Kan. 570, 583, 205 P.3d 715 (2009) (quoting *Schuck v. Rural Telephone Service Co.*, 286 Kan. 19, 26, 180 P.3d 571 [2008]).

At trial, Bill conceded that a confidential relationship existed between Unilda and Annita. Thus, the only true dispute as to constructive fraud was whether Annita betrayed this confidential relationship or breached a duty imposed by the relationship.

*Did Evidence Support That Unilda Gifted Bill the Emma Creek Property?*

Bill first argues that the trial court erred by finding he would be unjustly enriched by keeping the Emma Creek property because Unilda gifted him the property. Bill argues that if Unilda intended to receive payment for the Emma Creek property, she would have obtained a promissory note. Bill further contends that the handwritten note allegedly written by Unilda, excusing all the Webers' debts upon her death, proves that this was a gift.

Regardless of those facts, other facts showed that Unilda did not intend to gift the Emma Creek property to Bill. To summarize, the following evidence contradicts Bill's argument that Unilda gifted him the Emma Creek property: (1) Kenneth testified that

38

Unilda told him she expected to be paid by Bill for the Emma Creek property; (2) Hugh testified that Unilda expected to be paid by Bill for the Emma Creek property; (3) Hugh's notes recorded conversations concerning Unilda's belief that Bill was supposed to pay for the Emma Creek property; (4) Annita's deposition testimony stated that Bill might have owed money to Unilda for the Emma Creek property; and (5) monthly payments from Bill and Kandi to Unilda, totaling $12,250.

Because this court does not reweigh evidence, we are limited to determining whether the trial court's finding that Unilda expected to be paid was reasonable. Here, the trial court's finding was reasonable given that conflicting evidence supported that Unilda did not make a gift but intended to receive payments from Bill for the Emma Creek property. As a result, the trial court properly determined that Bill would be unjustly enriched if he kept the Emma Creek property.

*Does Evidence Support That Annita Committed Constructive Fraud?*

Next, Bill contends that there was no evidence supporting that Annita committed constructive fraud. Although somewhat unclear, it seems that Bill believes that Annita could not have committed constructive fraud because Unilda released her from the exchange agreement. Nevertheless, this argument ignores the obvious: Kenneth is suing because he claims that Unilda released Annita from the exchange agreement based on Annita's assurance that Bill would pay Unilda for the Emma Creek property. Consequently, Bill's argument falls short of the mark. Moreover, if Bill had other arguments concerning the trial court's finding that Annita committed constructive fraud, he has abandoned them by failing to raise those arguments in his brief. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 855, 889, 259 P.3d 676 (2011) (holding that an issue not briefed is abandoned).

39

All things considered, substantial competent evidence supports the trial court's finding that Annita procured her and Don's release from the exchange agreement by means of constructive fraud. Again, Bill conceded that a confidential relationship existed between Unilda and Annita. Thus, this element of constructive fraud was undisputed. Moreover, the following evidence indicates that Unilda released Annita and Don from the exchange agreement based on Annita's assurances of payment for the Emma Creek property: (1) Hugh testified that Annita told him that she and Unilda had followed through on the exchange agreement, when they had not done so; (2) Hugh's notes document that Annita told him that Bill would pay Unilda for the Emma Creek property; and (3) Hugh's notes document that Annita was supposed to write a letter and have Bill write a letter detailing the terms of repayment for the exchange agreement. Clearly, whether or not Annita intended to be deceitful, the evidence shows that Annita misused her position of confidence by reassuring Unilda that she would get paid for allowing Annita and Don to convey the Emma Creek property to Bill. Because this evidence supports that Annita committed constructive fraud, the trial court's constructive fraud finding was reasonable.

*Can Bill be Held Liable for Annita's Actions?*

Last, Bill argues that the trial court erred because Unilda merely "expected" to be paid based on Annita's constructive fraud. According to Bill, "[c]ourts have spoken to expectations in equitable circumstances and have held that expectations are not sufficient to establish legal liability even between contracting parties." Bill points out that the trial court's findings never stated that he understood Unilda's expectation of payment. Thus, Bill seems to contend that he cannot be held liable for unjust enrichment based on the actions of his mother.

Nevertheless, Bill takes a myopic view of what must be shown for unjust enrichment. To prove a claim of unjust enrichment, a plaintiff must establish that a

benefit was conferred on a defendant, the defendant had knowledge of this benefit and retained the benefit, but "*under the circumstances*, the defendant's retention of the benefit is unjust." [Emphasis added.] *Nelson*, 288 Kan. at 580. The phrase "under the circumstances" is very broad. It implies that there are a variety of ways that the retention of property may be unjust. Moreover, nothing within the elements of unjust enrichment states that the defendant has to have created or participated in the circumstances that make the retention of the property unjust.

Furthermore, in *Nelson*, our Supreme Court held that innocent third parties may be held liable for unjust enrichment. The *Nelson* court explained that a plaintiff may sue a defendant for unjust enrichment and recover by means of a constructive trust so long as the defendant has "'an equitable duty to convey [certain property] to [the plaintiff] on the ground that he would be unjustly enriched if he were permitted to retain it.'" *Nelson*, 288 Kan. at 580 (quoting Restatement of Restitution § 160). The only time an innocent third-party defendant cannot be held liable is when that defendant is a bona fide purchaser of the property in question. *Nelson*, 288 Kan. at 580 (quoting Restatement of Restitution § 168.) This conclusion is also consistent with the rulings of other jurisdictions. See *In re Marriage of Allen*, 724 P.2d 651, 660 (Colo. 1986) (holding that innocent third parties may be liable for unjust enrichment so long as they are not bona fide purchasers); and *Simonds v. Simonds*, 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978) (holding that a defendant may be sued for unjust enrichment so long as the defendant is not a bona fide purchaser because "[i]nnocent parties may frequently be unjustly enriched").

In this case, Bill is not a bona fide purchaser. Accordingly, Bill does not escape liability for unjust enrichment simply because Annita committed the wrongdoing that led to his retention of the Emma Creek property. As a result, the fact that the trial court failed to make a finding that he understood that Unilda expected him to make payments has no bearing on the outcome of this case.

41

*Did the Trial Court Impose Inappropriate Remedies?*

Next, Bill raises several arguments regarding whether the trial court imposed inappropriate remedies. Specifically, Bill argues: (1) that the trial court erred by failing to consider evidence that would "balance the equities" between the two parties; (2) that the trial court erred by imposing a constructive trust because Unilda had no equitable claim to the Emma Creek property; (3) that the trial court erred by imposing a constructive trust because the Emma Creek property is protected property under Kansas' constitutional homestead exemption rule; (4) that the trial court erred by holding him personally liable through a money judgment while also placing the Emma Creek property in a constructive trust; and (5) that the trial court erred by garnishing his wages.

*Standard of Review*

Whether the trial court applied the correct measure of damages is a question of law over which an appellate court has unlimited review. *Bank of America v. Narula*, 46 Kan. App. 2d 142, 176, 261 P.3d 898 (2011).

> "'Where a trial court has fashioned a remedy to make the injured party whole, the test on appellate review is not whether the remedy is the best remedy that could have been devised, but whether the remedy so fashioned is erroneous as a matter of law or constitutes a breach of trial court discretion.'" *In re Conservatorship of Huerta*, 273 Kan. 97, 99-100, 41 P.3d 814 (2002) (quoting *Gillespie v. Seymour*, 250 Kan. 123, Syl. ¶ 10, 823 P.2d 782 [1991]).

*Has Bill Failed to Establish That the Trial Court Erred by Failing to Consider Evidence That Would Balance the Equities?*

In addition to a jury instruction on balancing the equities, Bill argues that the trial court erred by failing to consider evidence that would balance the equities while ordering

the remedies for both Kenneth's unjust enrichment claim and Kenneth's breach of oral contract claim. Bill asserts that the trial court erred by not considering: (1) evidence that Annita and Don expected to be paid for their work on the Hoover Road apartment; (2) evidence that Annita and Don had to pay for mold cleanup at the Hoover Road house; and (3) evidence that the Hoover Road property was actually worth less than what Unilda and Annita originally thought.

Yet, in regards to the breach of oral contract claim, the trial court had no discretion to balance the equities. The breach of oral contract claim is a legal claim. The jury found that Annita breached an oral contract to repay Unilda $100,000. Accordingly, Bill, in his capacity as executor of Annita's estate, owes Unilda's estate $100,000.

In regards to the unjust enrichment claim, Bill was able to present evidence that his parents had cared for Unilda during life, had helped build Unilda's apartment, and had to spend money eliminating mold in the Hoover Road main house after moving in. Nevertheless, Kenneth presented conflicting evidence. For instance, Kenneth presented evidence that Unilda paid for the construction of her apartment. Kenneth also presented evidence that any work Don did at the apartment was nominal. Again, when reviewing the trial court's award of damages, this court will not reverse unless the trial court's award was so erroneous that it constituted an abuse of discretion. See *In re Conservatorship of Huerta*, 273 Kan. at 99-100. Clearly, given the conflicting evidence, this court cannot hold that the trial court abused its discretion by failing to subtract money that Annita and Don had allegedly spent on Unilda in awarding damages.

*Is Bill's Argument That Unilda Does Not Have an Equitable Claim in the Emma Creek Property Baseless?*

Bill's next argument hinges on the same theory as many of his previous arguments. Bill argues that Kenneth cannot recover for unjust enrichment because Unilda has no

equitable stake in the Emma Creek property given that she released Annita and Don from the exchange agreement.

Nonetheless, Bill's argument ignores that Kenneth's suit is based on the theory that Bill would be unjustly enriched if he were allowed to retain the Emma Creek property because Annita and Don conveyed the Emma Creek property to him as a result of Annita's constructive fraud. Kenneth argues that but for Annita's constructive fraud, Unilda would have never released Annita and Don from the exchange agreement; thus, Unilda would have obtained title to the Emma Creek property as stated under the exchange agreement. Consequently, Bill's argument that Unilda, and therefore Unilda's estate, does not have an equitable interest in the Emma Creek property is fatally flawed.

*Is Bill's Argument Concerning Kansas' Homestead Exemption Erroneous in Fact and Law?*

The trial court ruled that the Emma Creek property was not exempted under Kansas' homestead exemption rule because the rule does not provide protection when the homestead was procured by fraud. Bill argues that the trial court's ruling that the Emma Creek property was not protected under Kansas' homestead exemption rule was error because: (1) the house is his homestead; and (2) "[t]here was no dishonesty here."

Kansas' homestead exemption "was established for the benefit of the family and society 'to protect the family from destitution, and society from the danger of her citizens becoming paupers.'" *Redmond v. Kester*, 284 Kan. 209, 212, 159 P.3d 1004 (2007) (quoting *Morris v. Ward*, 5 Kan. 239, 244 [1869]). In relevant part, Kan. Const. art. 15, § 9, states:

> "A homestead to the extent of one hundred and sixty acres of farming land, or of one acre within the limits of an incorporated town or city, occupied as a residence by the

family of the owner, together with all the improvements on the same, shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists."

Nevertheless, our Supreme Court has held that although the homestead exemption rule should be liberally construed, "it was not designed to encourage fraud." *Exchange State Bank v. Poindexter*, 137 Kan. 101, Syl. ¶ 2, 19 P.2d 705 (1933). In turn, parties who have obtained property through unconscionable conduct should not be able to use the homestead exemption statute as a shield, preventing the rightful owner from obtaining recovery. See *Exchange State Bank*, 137 Kan. 101, Syl. ¶ 2. See also 40 C.J.S., Homesteads § 55, p. 289 (explaining that "[a] homestead cannot be employed as a shield and defense to a fraud. Where a fraudulent transaction has occurred, an equitable lien, which might arise, may be enforced against the homestead").

Here, despite Bill's assertion to the contrary, the trial court determined that Bill obtained title to the Emma Creek property through Annita's constructive fraud. Given our Supreme Court precedent that the homestead exemption rule does not apply in cases of fraud, we hold that the trial court properly refused to invoke the homestead exemption rule.

*Does Bill's Argument About Double Punishment and the Trial Court's Inability to Hold Him Personally Liable Have Merit?*

Unlike his previous arguments, Bill's next argument has merit. As Bill explains in his brief, not only did the trial court hold him personally liable to Unilda's estate for $100,000 based on Kenneth's unjust enrichment claim but also placed the Emma Creek property in a constructive trust. Bill argues that the imposition of both remedies unfairly penalizes him twice for the same conduct. Bill then suggests that the only appropriate

45

remedy for Kenneth's unjust enrichment claim is the imposition of a constructive trust, not a personal money judgment.

Kenneth responds that Bill has too narrow an interpretation of the available remedies. Yet, Kenneth fails to explicitly address whether the imposition of both the personal money judgment and the imposition of the constructive trust together were error.

*Available Remedies*

"'The substance of an action for unjust enrichment lies in a promise implied in law that one will *restore* to the person entitled thereto that which in equity and good conscience belongs to that person.'" [Emphasis added.] *University of Kansas Hosp. Auth.*, 299 Kan. at 960 (quoting *Haz-Mat Response, Inc.*, 259 Kan. 166, Syl. ¶ 5). "The proper measure of damages for unjust enrichment is *restitution of the value of the benefit conferred upon the defendant*." [Emphasis added.] *Estate of Hetrick v. Cessna Aircraft Co.*, No. 99,987, 2009 WL 1692025, at *6 (Kan. App. 2009) (citing *Peterson v. Midland Nat'l Bank*, 242 Kan. 266, 275-76, 747 P.2d 159 [1987]). Restitution has been defined as "recify[ing] unjust enrichment by restoring the other to the position he or she formerly occupied either by the return of something he or she formerly had *or* by the receipt of its equivalent in money." [Emphasis added.] 42 C.J.S., Implied and Constructive Contracts § 10, pp. 16-17. Accordingly, successful unjust enrichment plaintiffs will be placed in the same position that they would have been had the defendant not been unjustly enriched. In other words, for unjust enrichment claims, the ultimate goal is restoration not penalization.

One available remedy for unjust enrichment is a constructive trust. See *Nelson*, 288 Kan. 570, Syl. ¶ 4 (holding "[t]he constructive trust is a remedy for unjust enrichment"). In the past, our Supreme Court has explained that "an attempt to define or describe a constructive trust would be inadequate because such definition or description

46

would be too narrow in its scope and fail to include important types of constructive trusts." *Witmer v. Estate of Brosius*, 184 Kan. 273, 279, 336 P.2d 455 (1959). Nevertheless, as a general rule, "[a] constructive trust arises whenever the circumstances under which property was acquired make it inequitable that it should be retained by the person who holds legal title." *Kampschroeder v. Kampschroeder*, 20 Kan. App. 2d 361, Syl. ¶ 2, 887 P.2d 1152 (1995). After proving his or her claim by clear and convincing evidence, the successful constructive trust plaintiff

> "wins an in personam order that requires the defendant to transfer legal rights and title of specific property or intangibles to the plaintiff. When the court decides that the defendant is obliged to make restitution, it first declares him or her to be the constructive trustee and then orders him or her as trustee to make a transfer of the property to the beneficiary of the constructive trust, the plaintiff." *Nelson*, 288 Kan. 570, Syl. ¶ 5.

A separate and distinct remedy is a money judgment. "A person, who has a right to restitution other than the mere enforcement of an equitable lien, whether or not he is entitled to specific restitution, can obtain a money judgment against the recipient of the benefit." Restatement (First) of Restitution—Quasi Contracts and Constructive Trusts § 4, Comment e on Clause (f), p. 21 (1937).

*Additional Facts*

Following the jury verdict, Kenneth moved the trial court to adopt the jury's findings of fact on his unjust enrichment claim. Specifically, Kenneth requested that the trial court "enter a money judgment in his favor and against defendant Weber consistent with the jury's findings of fact—the judgment should be for $100,000.00 plus prejudgment interest" and place the Emma Creek property in a constructive trust "to secure the amount that plaintiff is entitled to recover for unjust enrichment."

47

At a hearing on the motion, Kenneth's attorney argued that the constructive trust was appropriate in addition to the $100,000 personal money judgment against Bill because constructive trusts are "the functional equivalent of a lien that can be foreclosed." Kenneth's attorney argued that he wanted to use the constructive trust to ensure they collected the $100,000 money judgment against Bill.

The trial court ultimately granted the request of Kenneth's attorney, entering a personal money judgment against Bill in the amount of $100,000 while additionally placing the Emma Creek property in a constructive trust. In deciding to place the Emma Creek property in a constructive trust as "ancillary relief," the trial court stated:

> "In this case, the jury made unanimous findings that Bill Weber would be unjustly enriched if he[] was permitted to retain the property on Emma Creek Road without paying for it. They also unanimously found that Annita Weber had engaged in constructive fraud by keeping the Emma Creek Road property without compensation to Mrs. Moffatt. . . . .
>
> "Though Bill Weber may not himself have been the person who committed the constructive fraud in this case, it is clear that he will benefit from the jury-determined fraud if he is allowed to keep the Emma Creek property without compensation to the Moffatt estate. As the transferee of the property, he stands in the shoes of the one who committed the fraud . . . .
>
> "Having considered the verdicts of the jury in this case, in light of the Court's own additional findings, the Court finds that the plaintiff should be entitled to have a constructive trust imposed on the Emma Creek Road property in plaintiff's favor."

*Analysis*

Although neither party has discussed it, it seems that the trial court used the constructive trust like a judgment lien. Yet, a constructive trust and a judgment lien are not interchangeable. As explained earlier, a constructive trust is a remedy in and of itself. A judgment lien, on the other hand, is not a remedy. A judgment lien under K.S.A. 60-

2202(b), is a lien imposed on a defendant's real property after a judgment in the plaintiff's favor to secure payment of the judgment.

This court has explained that "[o]btaining the benefit of a judgment lien, [] is a two-step process. First, the lien must attach to the real estate. Second, the lien may be enforced through some judicial proceeding." *Deutsche Bank Nat'l Trust Co. v. Rooney*, 39 Kan. App. 2d 913, 914-15, 186 P.3d 820 (2008). Thus, to impose a judgment lien, plaintiffs must comply with the provisions of K.S.A. 60-2202. In other words, a trial court cannot sidestep this two-step process by ordering a personal money judgment and a constructive trust.

Fundamentally, the trial court's orders were contrary to the purpose of a successful unjust enrichment claim, which is to place the plaintiff in the same position that he or she would have been in had the defendant not been unjustly enriched. The trial court's orders were also contrary to the doctrine of election of remedies, which arises when there are two or more remedies that are inconsistent. See *Griffith v. Stout Remodeling, Inc.*, 219 Kan. 408, 411, 548 P.2d 1238 (1976). The doctrine of the election of remedies demands that plaintiffs cannot obtain double redress for a single wrong. *Griffith*, 219 Kan. at 411.

In summary, to comply with the restorative purpose of unjust enrichment claims and the doctrine of election of remedies, the trial court should have imposed a personal money judgment *or* a constructive trust, but not both. As a result, the trial court clearly abused its discretion when it imposed both remedies.

Yet, this conclusion forces our consideration of Bill's second argument that the only appropriate remedy for Kenneth's unjust enrichment claim was a constructive trust. Bill points out that under Kenneth's theory of unjust enrichment, Bill was an innocent third party who obtained title of the Emma Creek property through Annita's constructive

49

fraud. Accordingly, Bill argues that the trial court could not have properly enter a personal money judgment against him.

Bill's argument is correct for two different reasons. First, Kenneth has not alleged that Bill committed any wrongdoing; thus, he has no ability to hold Bill personally liable. Black's Law Dictionary 1054 (10th ed. 2009) defines personal liability as "[l]ability for which one is personally accountable and for which a wronged party can seek satisfaction out of the wrongdoer's personal assets." In the past, our Supreme Court has explained that when a defendant commits fraud, then a plaintiff may sue for personal liability; yet, when there is no proof that the defendant committed fraud, a plaintiff has only an equitable right for the return of property. *Headrick, Admr. v. Yount*, 22 Kan. 344, 346-47 (1879). Here, Kenneth asserted that Bill was liable for unjust enrichment based on Annita's procuring the conveyance of the Emma Creek property by constructive fraud. Kenneth's evidence showed that Annita was the sole wrongdoer in the constructive fraud. Because Kenneth has failed to show that Bill participated with Annita in the constructive fraud, Kenneth cannot reach Bill's personal assets based on his theory of unjust enrichment. The only claim Kenneth has against Bill is equitable. As a result, Kenneth is limited to the remedy of constructive trust.

Second, claims for unjust enrichment are equitable, with the underlying goal being to restore the plaintiff to the position he or she would have been in had the defendant not been unjustly enriched. This means that unjust enrichment plaintiffs must try to recapture the property that was unjustly taken from them. Although plaintiffs may request a money judgment in equity, they can only do so when they have an equitable interest in the money. See Restatement (First) of Restitution § 4, Comment e on Clause (f), p. 21.

In his brief, Kenneth argues that he can receive a money judgment in equity on his unjust enrichment claim. To support his argument Kenneth cites *Consolver v. Hotze*, 51 Kan. App. 2d 286, 289, 346 P.3d 1094 (2015), *rev. granted* January 25, 2016, and

50

*Continental Oil Co. v. Ideal Truck Lines, Inc*., 7 Kan. App. 2d 153, 157, 638 P.2d 954 (1981). Nevertheless, *Consolver* was an equitable action for quantum meruit, where an attorney was trying to recover compensation for work already performed. 51 Kan. App. 2d at 289. Moreover, *Continental Oil Co*. involved an action for recovery of sums the defendant accidentally failed to pay plaintiff. 7 Kan. App. 2d at 159. Consequently, although both of these cases involved money judgments, the property at issue in those cases was money. The plaintiffs were able to recover money because they had an equitable interest in the money. Thus, the *Consolver* and *Continental Oil Co*. cases are distinguishable from this case because the plaintiffs in those cases attempted to recover the property they were entitled to receive in the first place.

*Conclusion*

The trial court erred when it held Bill both personally liable to Unilda's estate while also placing the Emma Creek property in a constructive trust. Moreover, because Kenneth sued for unjust enrichment on the basis that the Emma Creek property was conveyed to Bill by means of Annita's constructive fraud, the trial court could not hold Bill personally liable to Unilda's estate for $100,000. Again, evidence supports Unilda had an equitable basis in the Emma Creek property that would allow Kenneth to recover the Emma Creek property by way of a constructive trust. Accordingly, this remedy and this remedy alone was available. In conclusion, we vacate that part of the trial court's order holding Bill both personally liable and placing the Emma Creek property in a constructive trust and remand with directions to impose a constructive trust in favor of Kenneth on the Emma Creek property.

*Should Bill's Wages Have Been Garnished?*

Finally, Bill argues that the trial court should not have entered an order garnishing his wages because the judgment against him was not final given this appeal. Kenneth has not responded to this claim in his brief.

Because the trial court erred by holding Bill personally liable, it necessarily erred by allowing Bill's wages to be garnished as payment on this personal liability.

To summarize, Bill's argument is that the trial court erred by allowing his wages to be garnished because the judgment against him was not final. In *Cansler v. Harrington*, 231 Kan. 66, 73, 643 P.2d 110 (1982), however, our Supreme Court explained that an order of garnishment may be enforced when a "judgment becomes *effective*." (Emphasis added.) Thus, a judgment need not be final to enforce an order for garnishment. The *Cansler* court also explained that if the garnishee wants to stay an action for garnishment, the garnishee must post "a supersedeas bond in the amount of its liability plus costs and interest." 231 Kan. at 73. Based on the record on appeal, it seems that Bill never posted a supersedeas bond. Thus, although Bill is correct that the trial court erred by garnishing his wages, his argument as to why the trial court erred is incorrect.

*Did the Trial Court Err By Imposing Both Postjudgment and Prejudment Interest?*

For the unjust enrichment claim, the trial court imposed postjudgment interest at the statutory rate beginning October 2, 2014, the date of the jury's verdict. For the breach of oral contract claim, the trial court imposed prejudgment interest at the statutory rate beginning on May 6, 2011, the date Kenneth filed his petition, and postjudgment beginning on October 2, 2014. Bill takes issue with each of these rulings, arguing: (1) that the trial court could not impose postjudgment interest as of October 2, 2014, because postjudgment interest cannot accrue until the date a journal entry is filed; and (2) that the

trial court could not impose prejudgment interest on the breach of oral contract claim because Kenneth's request involves a claim for unliquidated damages.

A review of Bill's arguments establishes that the trial court erred by imposing postjudgment interest as of October 2, 2014, but he fails to establish that the trial court erred by imposing prejudgment interest on the breach of oral contract claim as of May 6, 2011.

*Standard of Review*

"The standard of review for allowance of prejudgment interest is a matter of judicial discretion subject to reversal only upon a showing of abuse of discretion." *Vernon v. Commerce Financial Corp.*, 32 Kan. App. 2d 506, 511, 85 P.3d 211 (2004). Judicial action constitutes an abuse of discretion when the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). To the extent the trial court's decision involving prejudgment interest involves statutory interpretation, however, the issue involves a question of law; thus, this court exercises unlimited review. *Vernon*, 32 Kan. App. 2d at 511.

*Postjudgment Interest*

Bill argues that the trial court erred by ordering that postjudgment interest should start to accrue on October 2, 2014, the date the jury returned its verdict, instead of May 19, 2015, the date the trial court filed its journal entry, for both Kenneth's unjust enrichment and breach of oral contract claims. The trial court erred by holding Bill personally liable, and this order must be reversed. Thus, the issue of whether the trial court properly calculated the postjudgment interest on this claim is irrelevant.

53

Regarding the breach of oral contract claim, Kenneth concedes that the trial court erred by awarding postjudgment interest beginning on the date of the jury verdict instead of the filing of the journal entry. Kenneth cites *McGuire v. Sifers*, 235 Kan. 368, Syl. ¶ 8, 681 P.2d 1025 (1984), which held that "[n]o judgment is effective unless and until a journal entry or judgment form is signed by the trial judge and filed with the clerk of the court," as support for his concession. Because Kenneth concedes this was error, we reverse and remand with directions to award postjudgment interest on the breach of oral contract claim starting May 19, 2015.

*Prejudgment Interest*

Bill argues that the trial court erred by awarding prejudgment interest on Kenneth's breach of oral contract claim because the claim was never liquidated. Kenneth responds that his claim became liquidated no later than August 18, 2010, because: (1) the amount due on the loan is undisputed; and (2) the date upon which this amount became due is August 18, 2010, the date the trial court found Unilda demanded repayment of the $100,000 check. Kenneth recognizes that his argument conflicts with the trial court's award of prejudgment interest as of May 6, 2011, the date he field his petition. Kenneth contends that the May 6, 2011, date was error, but he is "content" with this error given that he has not cross-appealed.

Issues concerning prejudgment interests are governed by K.S.A. 16-201. "In Kansas, the general rule is that prejudgment interest is allowable on liquidated claims." *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 925, 157 P.3d 1109 (2007). "A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain or when the same become definitely ascertainable by mathematical calculation." *Owen Lumber Co.*, 283 Kan. at 925. Moreover, the existence of a good faith controversy as to a party's liability does not bar a trial court from granting an award of prejudgment interest on a liquidated claim. *Owen Lumber Co.*, 283 Kan. at 926.

54

Here, Bill's primary argument concerning the claim being unliquidated is that "[t]here was nothing about any of the alleged obligations of the Webers that was ascertained, not the balance, not the due date, not the interest." Yet, this clearly ignores many facts presented during the jury trial. For instance, although Bill disputes that the check was a loan, neither party has ever disputed that the check was for $100,000. Thus, there can be no dispute that if there was an amount due, the amount due has always been $100,000. Moreover, regarding the date the $100,000 was due, Kenneth presented evidence at trial: (1) that Unilda always expected to be repaid for the $100,000 as she (a) told Ralph that it was a loan the moment she wrote the check in March 2007 and (b) told Hugh that the check was a loan as early as of November 2007; and (2) that Unilda made a specific demand for repayment on the Webers on August 18, 2010. Accordingly, as Kenneth argues in his brief, the evidence supports that the loan was due no later than August 18, 2010.

In turn, because both the amount due and the due date were fixed and certain by August 18, 2010, the trial court did not abuse its discretion by ordering that prejudgment interest accrue beginning on May 6, 2011, a date over 9 months after the demand. Consequently, Bill's argument regarding prejudgment interest fails.

*Conclusion*

To conclude, Bill has failed to establish: (1) that Kenneth lacks standing to bring his claims; (2) that Kenneth's claims are time-barred under the statute of limitations; (3) that the trial court abused its discretion; (4) that the trial court admitted inadmissible hearsay into evidence; (5) that the trial court erred by denying his requests for certain jury instructions; or (6) that the trial court erred by finding that he was unjustly enriched. Moreover, the trial court did not err by holding Bill liable in his capacity as executor of Annita's estate to Unilda's estate for $100,000 based on Annita's breach of oral contract to repay the loan. As a result, we affirm those rulings.

55

Nevertheless, for the unjust enrichment claim, the trial court erred by holding Bill both personally liable to Unilda's estate for $100,000 while also placing the Emma Creek Property in a constructive trust. Because Kenneth sued for unjust enrichment on the basis that the Emma Creek property was conveyed to Bill through Annita's constructive fraud, the only remedy available was placing the Emma Creek property in a constructive trust. Accordingly, for the unjust enrichment claim, we vacate the trial court's order holding Bill personally liable to Unilda's estate for $100,000. Consequently, we also vacate the order garnishing Bill's wages and the order awarding prejudgment and postjudgment interest on this improper $100,000 award. Finally, although we affirm the trial court's decision to grant prejudgment interest on the breach of oral contract claim as of May 6, 2011, the trial court erred when it ordered that postjudgment interest on the breach of oral contract claim started to accrue on the date the jury returned its verdict. Instead, postjudgment interest on the breach of oral contract claim started to accrue the date the journal entry was filed, which was May 19, 2015. Thus, we reverse and remand with directions to award postjudgment interest on the breach of oral contract claim beginning on this date.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.